UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

AMERICAN FIRE AND CASUALTY
COMPANY, as Subrogee of Precision
Machine Technologies LLC SPEX LLC,

                               Plaintiff,        DECISION and ORDER
v.                                   No. 6:21-cv-06122-CJS-MWP

ESCOTRONICS PRECISION
COMPONENTS, INC.,
                               Defendants.
_____

ESCOTRONICS PRECISION
COMPONENTS, INC.,

                         Third-Party Plaintiff,

v.

AMERISWISS TECHNOLOGY, LLC,

                         Third-Party Defendant.
_____

AMERISWISS TECHNOLOGY, LLC,

                    Second Third-Party Plaintiff,

v.

MAJOR WIRE, INC., SIRI WIRE
MANUFACTURING, INC., and ILLINI WIRE
MILL, INC.,
                    Second Third-Party Defendants.
_____

ILLINI WIRE MILL, INC.,

                  Third Third-Party Plaintiff,

v.

KING STEEL CORPORATION,

                  Third Third-Party Defendant.

_____

1

INTRODUCTION

American Fire and Casualty Co. ("American Fire"), as subrogee of Precision Machine Technologies LLC SPEX LLC ("Precision"), sued Escotronics Precision Components, Inc. ("Escotronics") for breach of warranty and indemnification.  (Dkt. 1). Now before the Court is American Fire's motion for summary judgment on its claims for breach of warranty and common-law indemnification against Escotronics.  (Dkt. 115). For the reasons discussed below, the Court grants the motion.

FACTUAL BACKGROUND

For many years, Ashcroft Inc. ("Ashcroft"), a manufacturer of low-pressure gauges, ordered from Precision[1], and Precision provided to Ashcroft, low-pressure tips ("Tips") to be incorporated into Ashcroft's products.  (Dkt. 115-26 at ¶ 3; Dkt. 121-3 at ¶ 3).  The purchase orders required that the Tips be composed of steel alloy 316 ST. STL.  (Dkt. 115-26 at ¶ 3; Dkt. 121-3 at ¶ 3).  From March 2017 to October 2018, Precision bought the Tips it sold to Ashcroft from Escotronics pursuant to purchase orders specifying that

---

[1]    American Fire issued Commercial General Liability policy, No. BKA (20) 56248512, with a policy period of September 1, 2019 to September 1, 2020, to Precision as the First Named Insured (the "AF Policy").  (Dkt. 115-26 at ¶ 1; Dkt. 121-3 at ¶ 1).  The AF Policy provides, in relevant part:

> 8. Transfer Of Rights Of Recovery Against Others To Us
>
> If the insured has rights to recover all or part of any payment we have made under this Coverage Part, those rights are transferred to us. The insured must do nothing after loss to impair them. At our request, the insured will bring "suit" or transfer those rights to us and help us enforce them.

(Dkt. 115-13 at 20; Dkt. 121-3 at ¶ 2).

the Tips be composed of alloy 316 ST. STL. to conform to Ashcroft's specifications.  (Dkt. 115-26 at ¶ 4; Dkt. 121-3 at ¶ 4; Dkt. 115-3; Dkt. 115-4; Dkt. 115-5).

The purchase orders stated that "[c]ertification is required to accompany every shipment." (Dkt. 115-3; Dkt. 115-4; Dkt. 115-5).  There are two such certifications in the record (Dkt. 115-6), which Escotronics agrees were sent to Precision.    However, Escotronics disputes that such fact "supports the suggestion that Certifications accompanied or applied to each shipment."  (Dkt. 121-3 at ¶ 6).

Ashcroft welded the Tips into the internal mechanism of pressure gauges it manufactured.  (Dkt. 115-26 at ¶ 7; Dkt. 121-3 at ¶ 7).  On October 30, 2019, Ashcroft notified Precision that laboratory tests revealed that the Tips failed to comply with the purchase order specifications requiring that they be composed of alloy 316 ST. STL and were instead composed of alloy 304 ST. STL.  (Dkt. 115-26 at ¶ 8; Dkt. 121-3 at ¶ 8; Dkt. 115-7).

On October 31, 2019, Precision notified Escotronics about Ashcroft's claim that the Tips were nonconforming.   (Dkt. 115-26 at ¶ 9; Dkt. 121-3 at ¶ 9).  Escotronics commissioned a test by Constellation Technology, an independent laboratory.  (Dkt. 115-26 at ¶ 10; Dkt. 121-3 at ¶ 10).  Prior to receiving the results of that test, Escotronics consulted a scrap metal dealer who advised that the steel was nonconforming.  (Dkt. 115-26 at ¶ 11; Dkt. 121-3 at ¶ 11). The tests performed by Constellation Technology confirmed that the steel in the Tips was nonconforming, as it was alloy 303 ST. STL. rather than the 316 ST. STL. specified in the purchase order.  (Dkt. 115-26 at ¶ 14; Dkt. 121-3 at ¶ 14).  Precision also commissioned its own tests from IMR Test Labs, which

3

reached the same conclusion.  (Dkt. 115-26 at ¶ 12; Dkt. 121-3 at ¶ 12).

Ashcroft claimed that the sale of nonconforming Tips constituted a breach of warranty and a violation of the Uniform Commercial Code, and that its use of the nonconforming material caused Ashcroft to incur significant expense, including destruction of inventory, manufacturing replacement products, providing notice and replacement products to distributors and catalogue houses, and other expenses.  (Dkt. 115-26 at ¶ 15; Dkt. 121-3 at ¶ 15).  Ashcroft alleged that the inclusion of Precision's product containing the Tips damaged Ashcroft's products, rendering them unusable, and that the products were not able to be repaired, as Ashcroft welded the Tips into the internal mechanism of its pressure gauges, many of which were already in commerce. (Dkt. 115-26 at ¶ 16; Dkt. 121-3 at ¶ 16).  Ashcroft demanded Precision reimburse it for the expenses incurred because of the non-conforming Tips.  (Dkt. 115-26 at ¶ 17; Dkt. 121-3 at ¶ 17). Ashcroft initially estimated its losses at $8 million, but ultimately made a demand for its estimated known actual, incidental and consequential damages of $427,722.  (Dkt. 115-26 at ¶ 17; Dkt. 121-3 at ¶ 17).

Precision tendered the defense and indemnity of the claims by Ashcroft to American Fire.  (Dkt. 115-26 at ¶ 18; 121-3 at ¶ 18).  On January 13, 2020, American Fire notified Escotronics by letter that Precision "received a notice of claim submitted by Ashcroft, Inc. due to a notice of recall of their product due to a defective part supplied by your company."  (Dkt. 115-26 at ¶ 19; Dkt.121-3 at ¶ 19; Dkt. 115-14 at 2).  American Fire advised Escotronics that "[o]ur investigation has determined that your company is liable for Ashcroft Inc.'s damages" and "[p]lease have your insurance claim representative who

is assigned to handle this matter on your behalf contact me at their earliest convenience."
(Dkt. 115-14 at 2).

By letter dated February 27, 2020, Precision placed Escotronics on notice that Escotronics had breached its warranty and violated the Uniform Commercial Code by selling nonconforming parts.  (Dkt. 115-26 at ¶ 21; Dkt. 121-3 at ¶ 21; Dkt. 115-11 at 2-7).  Precision stated that it "is looking to Escotronics to assume the lead in addressing this dispute to Ashcroft's satisfaction" and "[p]lease contact me — or direct Escotronics' legal counsel to contract me — upon receipt of this letter to discuss this matter at greater length."  (Dkt. 115-26 at ¶ 22;  Dkt. 121-3 at ¶ 22; Dkt. 115-11 at 3).  Escotronics did not provide a defense to Precision for the Ashcroft Claims.  (Dkt. 115-26 at ¶ 23; Dkt. 121-3 at ¶ 23).

In October 2020, Ashcroft settled its claims against Precision for $368,719.07, paid by American Fire.  (Dkt. 115-26 at ¶¶ 24, 25; Dkt. 121-3 at ¶¶ 24, 25).

## PROCEDURAL BACKGROUND

American Fire filed its complaint against Escotronics on February 4, 2021. (Dkt. 1).  Escotronics answered on March 10, 2021. (Dkt. 5).  Escotronics filed an Amended Answer asserting counterclaims on August 31, 2021.  (Dkt. 21).  American Fire filed its answer to the counterclaims on September 10, 2021.  (Dkt. 23).

Escotronics impleaded its supplier, Ameriswiss Technology, LLC, on October 7, 2021. (Dkt. 28).  Ameriswiss filed its answer on December 2, 2021.  (Dkt. 33).   On February 25, 2022, Ameriswiss impleaded its supplier Major Wire, Inc., along with Major Wire's suppliers, Siri Wire Manufacturing, Inc. and Illini Wire Mill, Inc.  (Dkt. 44).  Illini Wire

answered on May 4, 2022.  (Dkt. 59).  Major Wire moved to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2) on June 8, 2022.  (Dkt. 64).  Siri Wire moved to dismiss for insufficient service pursuant to Federal Rule of Civil Procedure 12(b)(5) on August 5, 2022.  (Dkt. 73).  Illini Wire impleaded its supplier, King Steel Corporation, on March 21, 2023.  (Dkt. 97).  King Steel moved to dismiss for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2); lack of subject-matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1); failure to state a clam upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Dkt. 103).  Ameriswiss agreed to discontinue its action against Siri, with prejudice, on October 25, 2024.  (Dkt. 124). The remaining motions to dismiss are pending.

American Fire moved for summary judgment against Escotronics on March 27, 2024.  (Dkt. 115).  Escotronics responded on June 6, 2024 (Dkt. 121), and American Fire filed its reply on July 8, 2024.  (Dkt. 122).  Ameriswiss also filed opposition to American Fire's motion (Dkt. 120), but as there is no motion pending seeking summary judgment against Ameriswiss the Court did not consider Ameriswiss's response.

<u>SUMMARY JUDGMENT STANDARDS</u>

"[T]he trial court's task at the summary judgment motion stage . . .  is confined . . . to issue-finding; it does not extend to issue-resolution."  *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).  Hence, summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

6

56(a).  "Material facts are those which might affect the outcome of the suit under the governing law, and a dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 148 (2d Cir. 2007) (internal quotation marks and citation omitted).

"At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007).  That is, where the moving party has carried its burden to demonstrate entitlement to judgment as a matter of law, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . ."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  A "party asserting that a fact . . . cannot be genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record . . . [or] showing that the materials cited do not establish the absence or presence of a genuine dispute. . . ." Fed. R. Civ. P. 56(c)(1)-(2).

<u>DISCUSSION</u>

I.    **Breach of Express Warranty**

Escotronics concedes that the Tips were nonconforming (Dkt. 115-23 at ¶ 28; Dkt. 121-3 at ¶ 28), but argues, *inter alia*, that there is a question of material fact as to whether Escotronics provided the Tips pursuant to an express warranty, since even though Escotronics admittedly provided certifications indicating that the Tips were composed of steel alloy 316 ST. STL with *some* shipments, the record does not conclusively show that Escotronics provided such certifications with *every* shipment.

As the underlying transaction involves the sale of goods, the New York Uniform Commercial Code ("U.C.C.") applies.  Pursuant to the U.C.C., an express warranty is an "affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain."  N.Y. U.C.C. § 2-313(1)(a).  The U.C.C. provides in relevant part that:

> (1) Express warranties by the seller are created as follows:
>
> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
>
> (b*) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.*
>
> (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.
>
> (2) *It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty*, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

N.Y. U.C.C. § 2-313 (emphasis added).

Under New York law, a claim for breach of express warranty requires plaintiff to prove: "'(1) the existence of a material statement amounting to a warranty, (2) the buyer's reliance on this warranty as a basis for the contract with the immediate seller, (3) breach of the warranty, and (4) injury to the buyer caused by the breach.'" *Schneider v. Colgate-Palmolive Co.*, 677 F. Supp. 3d 91, 102 (N.D.N.Y. 2023) (quoting *Colpitts v.*

*Blue Diamond Growers*, 527 F. Supp. 3d 562, 589 (S.D.N.Y. 2021)).

Escotronics argues that there is a triable issue of fact as to whether it made an express warranty to Precision that the Tips would all be composed of steel alloy 316 ST. STL, for two reasons: First, because although Plaintiff has shown that certifications indicating that the Tips were composed of 316 ST. STL. accompanied some shipments from Escotronics, Plaintiff has not shown that *every* shipment contained such a certification; and, second, because although Escotronics sent the certifications to Precision, the certifications themselves were *prepared by* third-party suppliers, not Escotronics. (Dkt. 121 at 7-8) ("Plaintiff submits only two material certifications: one from a Swiss wire supplier with a date of November 12, 2014, and one from Major Wire Incorporated with a 'date of shipment' of October 22, 2018. Plaintiff has made no attempt to explain or make a legal argument as to how these material certifications from other entities became the express warranty of Escotronics. Nor has Plaintiff offered any evidence as to whether these certifications accompanied each shipment of Tips from Escotronics[.]").

However, even without regard to the certifications, the Court finds as a matter of law that an express warranty was created by Escotronic's acceptance of Precision's purchase offer containing the specification that the Tips had to be composed of 316 ST. STL.[2] *See, Conductores Monterrey, S.A. de C.V. v. Remee Prods. Corp.*, No. 95 CIV.

---

[2] The Court finds no merit to Escotronic's arguments on this point in any event. As a preliminary matter, these are legal arguments about undisputed facts, which are, namely, that on at least two occasions during the course of a lengthy commercial relationship arising from a contract for the sale of Tips composed of 316 ST. STL., Escotronics provided Precision with written certifications that the Tips were composed of 316 ST. STL., when, in fact, the Tips were not composed of 316 ST. STL. The legal issues

7925 (BSJ), 2000 WL 1448609, at *8 (S.D.N.Y. Sept. 28, 2000) ("The parties do not dispute that the contract specifications for the fiber product required an attenuation level equal to or less than .39 db/km, measured at 1310 nm. Under § 2–313(b) of the UCC, any description of goods pursuant to a contract creates an express warranty that the goods will conform with that description.").

Precision bought the Tips from Escotronics pursuant to purchase orders requiring that the Tips be composed of alloy 316 ST.STL. (Dkts. 115-3; 115-4; 115-5). The Tips were then shipped by Precision to Escotronics without modification.  (Dkt. 115-1 at ¶ 7). Product specifications that accompany purchase orders create express warranties that the product provided will conform to the accompanying specifications.  *See Loeffel Steel Products, Inc. v. Delta Brands, Inc.*, 379 F. Supp. 2d 968, 982-83 (N.D. Ill. 2005) (technical specifications were affirmations of fact that the seller promised the machine

---

are whether, under the New York State UCC, it was necessary for the creation of an express warranty for Escotronics to have made the affirmation with regard to each shipment, and whether it matters that the affirmation Escotronics provided was written by someone else.  The Court answers both questions in the negative.  Even assuming arguendo that Escotronics provided Precision with only two certifications, those certifications are "affirmations of fact or promise made by the seller to the buyer which relates to the goods" or "descriptions of the goods," which no reasonable juror could find were not a basis of the bargain between Precision and Escotronics. *See, e.g., Allied Leather Corp. v. Interco Inc*., No. 88 CIV. 1394 (KTD), 1993 WL 159970, at *4 (S.D.N.Y. May 10, 1993) ("Pursuant to U.C.C. § 2–313(b), "[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.""), amended, No. 88 CIV. 1394 (KTD), 1993 WL 267280 (S.D.N.Y. July 14, 1993); *see also, Murphy v. Mallard Coach Co*., 179 A.D.2d 187, 189, 582 N.Y.S.2d 528 (1992) ("While the warranty herein was technically handed over after plaintiffs paid the purchase price, the fact that it was given to plaintiffs at the time they took delivery of the motor home renders it sufficiently proximate in time so as to fairly be said to be part of the basis of the bargain."). Escotronics has provided no legal authority indicating that for an express warranty to be formed, the seller's affirmation must be repeated with each shipment of similar goods, nor has the Court found any.  Nor does the Court find it relevant that the certifications provided by Escotronics may have related to testing performed by third parties, since the certifications were clearly statements of fact about the Tips and/or descriptions of the Tips upon which Precision was expected to rely, and did rely, as a basis of the bargain.  In sum, the Court finds that Escotronics made an express warranty about the Tips being composed of 316 ST. STL. when it provided the certifications to Precision, and that Escotronics undisputedly breached the warranty by providing Tips that were not composed of 316 ST. STL.

would meet); *Global Petromarine v. G.T. Sales & Mfg., Inc.*, 2010 WL 5257659, at * 5-6 (W.D. Mo. 2010) (technical specifications referenced in both quotation and purchase order were express warranties that were part of the basis of the bargain).

As set out in N.Y. U.C.C. § 2-313 note 5:

A description need not be by words. Technical specifications, blueprints and the like can afford more exact description than mere language and if made part of the basis of the bargain goods must conform with them. Past deliveries may set the description of quality, either expressly or impliedly by course of dealing. Of course, all descriptions by merchants must be read against the applicable trade usages with the general rules as to merchantability resolving any doubts.

N.Y. UC.C. § 2-313 at n. 5; *see also Hempchain Farms, LLC v. Sack*, 516 F. Supp. 3d 197, 209 (N.D.N.Y. 2021) (description by the seller about seeds for sale including germination rate, purity, and percentage of dormant hard seed sufficient to state claim that seller created, by description, an express warranty); *Conductores Monterrey, S.A. de C.V. v. Remee Products Corp.*, No. 95 Civ. 7925 (BSJ), 2000 WL 1448609, at *8 (S.D.N.Y. 2000) (specifications regarding fiber optic cable created express warranty); *Scott v. Illinois Tool Works, Inc.*, 217 Mich. App. 35, 42-43  (1996) (description of that strapping was to have "AVE. BREAKING STRENGTH: 800 LBS" created an express warranty that "the strapping was to have an average breaking strength of eight hundred pounds") (emphasis omitted)); *Shop Vac Corp. v. BCL Magnetics Ltd.*, No. 04-CV-262, 2005 WL 2739161, at *6 (N.D.N.Y. Oct. 24, 2005)  ("Even assuming that the purchase order was the entire agreement, Plaintiff may establish a viable breach of express warranty claim based upon the terms of the contract.  . . .  As indicated above, the purchase order references the part print.") (citations omitted).

11

Moreover, Section 2-206(1)(b) provides that shipment of either conforming or nonconforming goods in response to an offer for prompt or current shipment is an acceptance.  If the goods are nonconforming, the seller has also simultaneously breached.  *See, e.g., Starbucks Corp. v. Amcor Pkg. Dist.*, Civ. No. 2:13-1754 WBS CKD, 2016 WL 3543371 (E.D. Calif. June 24, 2016) (contract was formed under Section 2-206 when order for prompt or current shipment was accepted with condition that goods would conform to buyer's specification sheet); *see also Yusin Brake Corp. v. Motorcar Parts of Am., Inc.*, No. 13 civ. 9223 (DLC), 2014 WL 2560612, at * 6 (S.D.N.Y. June 6, 2014) ("When Motorcar signed purchase orders that offered to buy goods (specified by type, quantity, and cost), and Plaintiffs accepted by shipping conforming goods, this is conduct "sufficient to show agreement." N.Y. U.C.C. Law § 2–204(1). Thus, Plaintiffs have adequately pleaded that each purchase order signed by Motorcar constitutes an enforceable contract between Motorcar and Plaintiffs."); *Mid Atlantic Int'l, Inc. v. AGC Flat Glass N. Am., Inc.*, No. 2:12cv169, 2014 WL 504701, at * 5 (E.D. Va. Feb. 7, 2014) ("[P]urchase orders were offers that were accepted by MidAtlantic when it engaged in performance based on the requirements and specifications of the purchase orders. While MidAtlantic can argue that other parts of the purchase orders may or may not be ambiguous, there was nothing unclear about the 30 mesh requirement or the other specifications for the dolomite that required explanation or supplementation.").

Here, it is undisputed here that the purchase orders specified the Tips be made with 316 ST. STL.  (Dkt. 115-26 at ¶ 4; Dkt. 121-3 at ¶ 4).  Escotronic's acceptance of the purchase orders and shipment of the goods created an express

warranty.  It is also undisputed that the Tips provided pursuant to the purchase offers were nonconforming.  (Dkt. 115-26 at ¶¶ 10, 11; Dkt. 121-3 at ¶¶ 10, 11).  On this record, a reasonable juror could only conclude that the Tips were provided pursuant to an express warranty that was breached by the provision of nonconforming Tips.  The Court thus grants summary judgment to American Fire on the issue of liability for breach of express warranty.

## II.    UCC Damages

The U.C.C. sets out the rules governing the damages due for breach of warranty, providing in relevant part that:

(1) Where the buyer has accepted goods and given notification (subsection (3) of Section 2-607) he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

(3) In a proper case any incidental and consequential damages under the next section may also be recovered.

U.C.C. § 2-714.

The UCC further provides in relevant part:

(1) Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

(2) Consequential damages resulting from the seller's breach include

13

(a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise . . .

N.Y. U.C.C. § 715.  "Subsection (2) operates to allow the buyer, in an appropriate case, any consequential damages which are the result of the seller's breach." N.Y. U.C.C. § 715 at n. 2.  "[T]he seller is liable for consequential damages in all cases where he had reason to know of the buyer's general or particular requirements at the time of contracting."  *Id.* at n. 3.  "The burden of proving the extent of loss incurred by way of consequential damage is on the buyer," *id.* at n. 4, "but the section on liberal administration of remedies rejects any doctrine of certainty which requires almost mathematical precision in the proof of loss. Loss may be determined in any manner which is reasonable under the circumstances."  *Id.*

American Fire relies on *National Eastern Corp. v. Vegas Fastener MFG*, No. 3:04cv706(JBA), 2006 WL 758634 (D. Conn. March 24, 2006).  There, defendant manufacturer provided nonconforming goods for use in a bridge project by plaintiff, a subcontractor.  *Id.* at * 1.  The nonconforming materials corroded, and were removed and replaced by the general contractor.  *Id.*  The general contractor, who bore the costs of removal and replacement, passed on the costs to the plaintiff.  *Id.*  Plaintiff then sought to recover from defendant.  As to damages, the court noted that "while the parties' briefing disputed the actual amount of damages," a subsequent arbitration set the amount of the back charges at $98,146.00.  *Id.*  Based on that award, the court found that "[d]efendant is thus liable to plaintiff for consequential damages incurred by plaintiff as a result of the nonconformity in the amount of $98,146.00."  *Id.* at * 4.

American Fire argues that here, the settlement agreement requiring Precision to pay Ashcroft $368,719.07 suffices to set the amount of damages owed for Escotronics' breach of warranty. (Dkt. 115-27 at 14).

Escotronics argues that American Fire cannot use the amount paid out to Ashcroft as an appropriate measure of damages under the U.C.C. because "[t]he Settlement Agreement between Ashcroft, Precision, and American Fire does not indicate what damages were compensated." (Dkt. 121 at 8). It further argues that the April 6, 2020 letter from Ashcroft's counsel setting out Ashcroft's damages (Dkt. 115-10) is inadmissible hearsay. (Dkt. 121 at 8). It also notes that the letter from Ashcroft's counsel includes a figure for attorneys' fees, which are generally not recoverable under the U.C.C. (Dkt. 121 at 9). American Fire's reply does not defend the admissibility of the April 6, 202 letter. (Dkt. 122 at n. 4).

Neither party cites to, nor did the Court's research reveal, a case where the amount provided for in a settlement agreement was used to set the amount of damages owed for U.C.C. claim for breach of warranty. *National Eastern* is not persuasive here, as the amount of consequential damages there was set based on an arbitration award, not a negotiated settlement. Because the U.C.C. limits the type of damages that may be recovered for breach of warranty, *see, e.g.,* U.C.C. §§ 714, 715, American Fire cannot recover on summary judgment based on solely on the amount the parties agree to settle for. As discussed below, American Fire does point to evidence that attorneys' fee were not included in the settlement amount, but does not provide a detailed accounting of what damages the settlement amount covered. Given this, the Court

declines to award American Fire damages under the U.C.C. based on the amount set forth in the Settlement Agreement.

III.    **Common-law indemnification**

Common-law indemnification allows a party who was compelled to pay to seek recovery from a second party, and "is generally available 'in favor of one who is held responsible solely by operation of law because of his relation to the actual wrongdoer,'" *McCarthy v. Turner Constr.*, 17 N.Y.3d 369, 375 (2011) (quoting *Mas v. Two Bridges Ass'n*, 75 N.Y.2d 680, 690 (1990)).  "The New York rule is that indemnity is available to the passive wrongdoer from the active or principal wrongdoer." *Jack Frost Labs., Inc. v. Physicians & Nurses Mfg. Corp.*, 92 Civ. 9264 (MGC), 1995 WL 293328 at * 4 (S.D.N.Y. May 12, 1995).

In New York, an indemnity claim arising under the U.C.C.—unlike an indemnity claim based arising under tort—is available even if the indemnitee participated in the wrongdoing.  *Bellevue South Associates v. HRH Construction Corp.*, 78 N.Y.2d 282, 295-96 (1991). There, a building owner sued its subcontractor, Circle Industries Corp. ("Circle"), who installed defective wooden flooring; and the manufacturer of the flooring, Masonite Corp. ("Masonite").  As relevant here, Circle sought common-law indemnification from Masonite based on a theory of breach of implied warranty.  *Id.* at 295.  The Appellate Division held that Circle could not prevail on its implied warranty indemnity claim because "Circle is not an innocent party entitled to shift liability to Masonite," *id.* at 297-98, but the Court of Appeals rejected that holding.  Instead, the Court of Appeals found that Circle's common-law indemnification claim was not "barred

16

as a matter of law by [Circle's] own conduct." *Id*. The Court of Appeals explained that:

> The right of one party to shift the entire loss to another—indemnification—may be based upon an express contract or an implied obligation, as is the case here. Implied indemnification claims, in turn, may rest on various independent grounds—for example, indemnity may be appropriate because of a separate duty owed the indemnitee by the indemnitor, or because one of two parties is considered actively negligent or the primary or principal wrongdoer.
>
> In the present case, the Uniform Commercial Code creates an implied warranty between Circle and Masonite, and Circle has grounded its indemnification claims in this legal relationship as well as Masonite's active negligence in manufacturing and furnishing the floor tiles. Although the issue has never been directly addressed by this Court, courts in other jurisdictions have recognized that implied warranty may provide the requisite basis for an indemnification claim. It is the implied warranty theory—not concern over primary fault—that is determinative of such an indemnity claim, and that warranty must be examined on its own terms.

*Id*. at 296 (internal citations omitted).

The Court of Appeals noted that in some cases, "a plaintiff's theory of liability against the indemnitee would, as a matter of law, preclude recovery against the indemnitor." *Id*. It discussed its decision in *Mas v. Two Bridges Assocs.*, 75 N.Y.2d 680 (1990), where:

> the plaintiff, who had been injured while attempting to exit a disabled elevator, sued the owner of the building and Otis Elevator Company, the company that had contracted to maintain the elevator. The theories of liability asserted against the owner were failure to maintain and repair the elevator and failure to provide assistance. The jury apportioned 85% liability for failure to maintain and 10% liability for failure to respond. This Court upheld the owner's judgment on its indemnity cross claim against Otis for 85% of the damages, even though the owner had been found 10% liable for failure to respond. Had the only cause of action been for failure to respond, no indemnity based on the contract for repair would, as a matter of law, have been available to the owner.

*Id*. But in *Bellevue*, the Court noted, "the basis for the cause of action" "was entirely

17

consistent with Circle's implied warranty indemnity claim against Masonite." *Id*.

*Bellevue* is on point and controlling. Precision's liability flows from moving the Tips through to Ashcroft without knowledge of the fact that the Tips were nonconforming. *Bellevue* makes clear that even if Precision breached its agreement with Ashcroft by providing nonconforming Tips, it may pursue its implied indemnification claim based on Escotronics' breach of warranty. In other words, common-law indemnification is available where a party's role in causing the injury at issue is solely passive, such that its liability is vicarious. *See, e.g., Bd. of Managers of Olive Park Condo. v. Maspeth Props., LLC,* 95 N.Y.S.3d 344, 346 (2d Dep't 2019) (dismissal of claim for common-law indemnification proper where defendants "retained certain contractual responsibilities regarding the project and that any recovery against them would be based on their own failure to uphold those responsibilities."); *Bd. of Managers of 125 North 10th Condo. v. 125 North 10, LLC,* 55 N.Y.S.3d 374, 376 (2d Dep't 2017) ("evidence established that the sponsors retained certain responsibilities with regard to the performance of services . . . and further demonstrated that any liability of the sponsors to the plaintiff would be premised upon the affirmative wrongdoing of the sponsors and would not be purely vicarious."); *see also, e.g., Durabla Mfg. Co. v. Goodyear Tire & Rubber Co.*, 992 F. Supp. 657, 660 (S.D.N.Y. Feb. 3, 1998) (causes of action for implied indemnification based on warranties of suitability and merchantability based on a theory that "the liability is truly vicarious, i.e. implied by operation of law, and therefore a claim for indemnification can properly be pled); *Jack Frost*, 1995 WL 293328 at * 4 ("*In Bellevue South*, the Court of Appeals held that a subcontractor could bring an

action for indemnity against the manufacturer of defective floor tiles on a theory of implied warranty of merchantability under U.C.C. § 2-314."); *County of Monroe v. Raytheon Co.*, 602 N.Y.S.2d 743, 749 (Sup. Ct. Monroe Cty. 1991) ("Negligence-based implied indemnity (not at issue here) and contract-based implied indemnity have different elements. Innocence, which is relevant to a negligence-based indemnity claim, is not necessary for a contract-based implied indemnity claim.").

### IV.    Good faith settlement

Under New York law, "[w]hen an indemnitor has notice of the claim against it, the general rule is that the indemnitor will be bound by any reasonable good faith settlement the indemnitee might thereafter make." *Fidelity Nat'l Ins. Co. of N.Y. v. First N.Y. Title & Abstract Ltd.*, 707 N.Y.S.2d 112, 113-14 (2d Dep't 2000).  "Where the record establishes that the indemnitor received such notice, the indemnitee made a reasonable settlement in good faith, and the indemnitee 'could have been held liable if it had proceeded to trial,' the indemnitor is obligated to indemnify the indemnitee for the settlement amount." *Nesterczuk v. Goldin Mgmt., Inc.*, 911 N.Y.S.2d 367, 371 (2d Dep't 2010) (quoting *Fidelity Nat'l Ins.*, 707 N.Y.S.2d at 112) (finding that "the sponsor established its entitlement to judgment as a matter of law on that portion of its cross claim which was for contractual indemnification covering the settlement it paid to the plaintiffs by showing that the contractor was on notice of the plaintiffs' claims against the sponsor, the reasonable possibility that those claims were encompassed by the indemnification clause, that the settlement was reasonable and made in good faith, and that the sponsor could have been found liable to the plaintiff").

19

Here, the record established it is undisputed that Escotronics had notice of Ashcroft's claim. On January 13, 2020, American Fire sent Escotronics a letter that Precision "received a notice of claim submitted by Ashcroft, Inc. due to a notice of recall of their product due to a defective part supplied by your company." (Dkt. 115-26 at ¶ 20; Dkt. 121-3 at ¶ 19; Dkt. 115-14). Precision, in a letter dated February 27, 2020, placed Escotronics on "notice pursuant to Conn. Gen. Stat. Section 42-a-2-607(3) of Escotronic's breach of warranty and violation of the U.C.C. as adopted by Connecticut law." (Dkt. 115-26 at ¶ 21; Dkt. 121-3 at ¶ 21; Dkt. 115-11). The letter also stated that Precision "[i]s looking to Escotronics to assume the lead in addressing this dispute to Ashcroft's satisfaction" and to "please contact me—or direct Escotronics' legal counsel to contract me—upon receipt of this letter to discuss this matter at greater length." (Dkt. 115-11 at 3). In subsequent emails discussing the extent of Ashcroft's damages, Escotronics stated "let's work in a parallel manner at this point. If you can attempt to get Ashcroft to its bottom-number, perhaps we can work something out." (Dkt. 115-15 at 4). It is undisputed that Escotronics did not provide Precision with a defense for the Ashcroft Claims. (Dkt. 115-26 at ¶ 23; Dkt. 121-3 at ¶ 23). Based on this record, a reasonable juror could only conclude that Escotronics had notice of the claim and an opportunity to take over the defense.

The next issue is whether the settlement reached with Ashcroft was reasonable. "In the context of indemnification, courts routinely find settlements to be 'reasonable' when the recovery at trial could have been greater." *Koch Indus., Inc. v. Aktiengesellschaft*, 727 F. Supp. 2d 199, 225 (S.D.N.Y. 2010). Here, Ashcroft initially

20

estimated its losses at approximately $8 million. (Dkt. 115-1 at ¶ 12; Dkt. 115-8). Ashcroft subsequently revised the estimate of its actual, incidental and consequential damages at $449,788, and later at $427,722. (Dkt. 115-1 at ¶ 12; Dkt. 115-10). The claims were ultimately settled for $368,719.07. (Dkt. 115-1 at ¶ 15; Dkt. 115-16). Attorney Dirk D. Bender, who negotiated the terms of the settlement reach with Ashcroft, averred that the settlement did not include any recovery for attorneys' fees. (Dkt. 122-1 at ¶¶ 4, 6; Dkt. 122-2).

As detailed above, there is no question that the Tips were nonconforming, making it unlikely that Precision could mount a successful defense. There is evidence in the record that Ashcroft provided evidence to support its damages analysis, and Precision sent the documentation to forensic analysts for review. (Dkt. 115-15 at 2, "The forensic accountant [Precision] retained to review Ashcroft's damages completed their review."; *id.* at 3, "Last month, Ashcroft forwarded to my office a box containing documentation to support its damages analysis."). Escotronics offers nothing but speculation as to why the settlement was unreasonable.

Given that Escotronics failed to identify record evidence demonstrating the existence of material issues of fact regarding Precision's good faith and the reasonableness of its settlement, the Court grants American Fire's motion for summary judgment. *See, e.g., Tokio Marine & Fire Ins. Co. v. Pagan*, No. 02 Civ. 4211(JSR), 2003 WL 1858147, at * 2 (S.D.N.Y. April 9, 2003) (rejecting indemnitors' request for a trial on reasonableness and good faith of settlement because indemnitors "failed to adduce any competent evidence of record that materially supports" their speculation

that indemnitees, inter alia, "settled hastily, without sufficient investigation of the damages and the various defenses available to the [indemnitors] against [the original plaintiff]").

**V.    Damages**

Finally, Escotronics argues summary judgment is inappropriate because American Fire failed to account for a $57,175 credit it issued to Precision.  (Dkt. 121 at 10).  Without conceding that such a setoff is appropriate, American Fire agrees to reduce the amount it seeks in damages from $368,719.07 to $311,544.07 to account for the credit.  (Dkt. 122 at 2).  The Court grants American Fire damages of $311,544.07, plus interest, from November 13, 2020 onward.

CONCLUSION

For the reasons discussed above, American Fire's motion for summary judgment (ECF No. 115) is granted.

SO ORDERED.

Dated:   Rochester, New York
          December 17, 2024

ENTER:

CHARLES J. SIRAGUSA
United States District Judge